The first case we'll hear this morning is United States v. Sherwood, No. 23-5122. Counsel, you may proceed. Good morning. May it please the Court. My name is William Lunn, and I represent Adam Sherwood, who is the appellant in this case. The Fourth Amendment protects Americans against unreasonable searches and seizures. This case involves a police officer who over and over and over again during a traffic stop conducted unreasonable searches and seizures against the appellant. The first involved the stop of what was a white Chevrolet Silverado pickup truck. Terry requires that you must have reasonable suspicion that criminal activity is afoot. And Los Chifados indicates that the suspicion has to be particular to the person that stopped. This is a case where a white Chevrolet Silverado pickup truck is a very common truck. And it's one that, in fact, if you go drive around Tulsa or Oklahoma City or almost any town in the West, you'll find a white Chevrolet Silverado pickup truck during the course of your trip because there are so many of them on the road. I included the figures for 2014, 16.5 million cars sold and 404,000 of them were Chevrolet Silverados. At that time, there were 25 percent that were white, but probably that figure is even more now. So the officer in this case acknowledged that this was a not uncommon vehicle. But the 911 call identified the vehicle as a white Chevrolet Silverado, correct? It did. It did. And you argue that one out of 100 cars are white Chevrolet Silverados. Why doesn't that support reasonable suspicion? Because I think the time factor. You've got so many cars that white Silverado pickups simply are not at all uncommon. That's a reasonable suspicion. I mean, if you get a 911 call, and it's not just one 911 call. We know that. There were multiple 911 calls. And it matches that car. Reasonable suspicion is not a high bar. Why wouldn't it be reasonable for a police officer to say, you know, we have a 911 call about a shooting of a white Chevrolet Silverado. I better check this out. I mean, wouldn't it be remiss for an officer not to check it out? No, because 34 minutes had passed, and that's a long period of time. 34 minutes isn't very long from a 911 call, and it identifies the car in the vicinity. I mean, how much more specificity do you need beyond information about the truck's color, make, model, and location in 34 minutes? That's not enough for reasonable suspicion? I don't think so. Certainly the government found. Give me an example of where a court's thrown out a traffic stop on those facts. Well, the government cited six cases or so, and none of them involved where you had some of your vehicles. I'm asking you for a case. I'm not asking for the government's. Do you have a case that supports your position? No, no, there's not a case of 34 minutes more in specific. What was it? Eight 911 calls? Yes, and those, of course, go much earlier in time to a place that's some three miles away. Let me ask you how that cuts, though. So I definitely understand, Mr. Blunt, your argument about the 34 minutes, but doesn't, at least, it create a potential argument for reasonable suspicion that the first 911 call was from several miles away, that it was a similar vehicle, and then it gets to this, I think, 6415 South Mingo in several miles. And so doesn't the litany, the sequence of 911 calls, and the knowledge, or at least the potential inference from the fact that the 34 minutes could be attributable to the fact that this vehicle is traveling this area. Does the fact that the original call was several miles away, does that undermine your argument about the 34 minutes? Yes, and I've thought of that. But in this case, you have two officers who came out to the scene almost immediately, and they were looking for the truck, and it simply wasn't there. The truck had sped off in a high rate of speed to the south. And here you have this car that isn't driving in any suspicious manner, and he says that he's actually looking for a motel, which there were motels that were there. That's post-stop. Yes. But it's perfectly reasonable to think that this is somebody who is going about their ordinary daily activities. And in answer to the Court's question about cases, Madrid is probably a good case, which is time is a factor, and it's best if the person is caught basically near the time of the act, of the actual commission of the offense. Mr. Lund, I don't work out of drill, so forgive us, but let me ask you about sort of the ubiquity of this white Chevrolet Silverado. I think it's a very creative, and I don't mean that, very good argument that you're making. On the other hand, let's just say it's a black SUV, a little bit more generic definition, even more common than a white Chevrolet Silverado. There's not a lot of vehicles that are traveling in most areas, particularly this area, at 12.7 in the morning. And so even if there are millions and millions and millions of white Chevrolet Silverados, it's a great seller. Well, there weren't, presumably, a whole lot of vehicles that are traveling 6415 South Mingo in an area, in a parking lot, where everything's closed at 12.7 in the morning. Maybe unless they're looking for a hotel. That's the only thing I can say, and I think that that's what happened here. We also have an officer who claims that the license plate lights were out in his car. Well, is that right? I thought that the Oklahoma law was not that the lights were out, but that the law said that the lights have to illuminate the tag at 50 feet. And so, is that right? Yes, that's correct. And so after reading it, I didn't know, I'm from Oklahoma too, and I didn't know about such a law, so I've been doing my own little experiment. And I haven't ever seen, maybe it's my bad eyesight, of being able to identify a license plate, daytime or at nighttime, from 50 feet. So even if the lights were on, wasn't there still reasonable suspicion to believe that the tag wasn't illuminated sufficiently to be legible at 50 feet? I think the officer's position was that they were, I thought that he was of the opinion that they were not working. Well, I think that's right. But in an objective test on reasonable suspicion, regardless of what the officer's intent was, or why he thought that Mr. Sherwood had violated the law, isn't it an objective test on the legibility? Yes. And I think in this case you have an additional factor here that's rather important, which is that the jurors come back with the note that says, we think that it was obviously illuminated. Well, so I thought about that one and I looked at the video. I mean, the video at the furthest shows the license plate and the little light from me to you. It wouldn't show, it wouldn't be relevant for whether you could see it from 50 feet in accordance with the statute. I think to the extent that the license plate on a manufactured car, where they obviously are designed for the purpose of illuminating the license plate, the fact that they're working says a lot. I don't disagree with you as we just sit here and kick it back and forth today, but there's nothing in the record that shows that. There's no testimony from anybody that you could read the license plate from 50 feet away or anything like that. Well, again, all we've got is what the jurors have said, and they were certainly convinced that this was maybe not a legal stop. Well, tell me this. Let's assume that they were working. Let's also assume that we determine that the stop was okay based on the report of the Silverado pickup in the vicinity in the shooting, that that was enough. Is there any need to even consider the license plate illumination further? I want you to assume that we were to determine that the stop was legitimate based on the 911 call alone. Okay, all right. Do we care about the illumination? You don't care about the illumination at that point. I agree. I know you've got some other issues, but isn't it relevant that the 911 calls reported shooting, and isn't there a public safety issue related to this stop? I don't deny that there is, but it is. What's wrong with the police saying we're concerned about shooting coming from a white Chevrolet Silverado, and if we see one, we better stop it so nobody gets hurt? Well, the fact that it gives the officers excessive discretion to stop any car. You've got eight reports out there of gunfire coming from a white Chevy Silverado, and you're just going to let that go? Yes. In this instance, to use Daniel's term, it's super generic, and it's nothing but an arbitrary hunch. And in this instance, that hunch was wrong. Eight calls is an arbitrary hunch? Yes. Okay. Judge, I'm going to move to the frisk real quick, because this is a case where we have an appellant who has no criminal record. He may be around other people that do, but there's nothing about him that suggests that he's armed and dangerous. Did he tell the officer he had a pocketknife in his pocket? He does have a pocketknife. Twice? Yes. So what's wrong with checking that out? Well, because under both Melloff and Albert, all you get to do is to feel the frisk of his outer garment and try and identify where there is a pocketknife, and if you don't find that. Yeah, isn't that the problem, though, that Mr. Sherwood said? I think it was, yeah, I've got a knife, a pocketknife, and it's in my left front pocket. And so you're absolutely right, I think, that the cases say that generally you're only supposed to frisk the outer layer of the pocket, but here the anomaly is there's no reason to do that. He's already told the officer what the weapon is and exactly where it is, so it seems that a conventional frisk would be silly, and so he's got two choices. Okay, hand me your dangerous weapon, doesn't seem like a prudent thing to do, or he's told him where it is, reach in, get the knife. Well, he reaches in and he doesn't find the knife, he finds the other stuff. The officer testifies, however, both at the trial and at the suppression hearing, that he did feel and he didn't feel and he did not feel the weapon. Yeah. Now the cases are very clear that under that circumstance you don't get to go rummage around. That seems even more problematic to me, though, because you've been told there was a knife, you do a pat down, and you don't find it, and it seems like you definitely don't want to, for officer safety purposes, let go at that point and not check further. Well, the way you check further is that you feel around a little bit more until you can actually identify the outline of the pocket knife. You just don't go stick your hand into a pocket and pull out everything, because that's what makes it a general search. Those are the things. Could I just ask you, if the frisk wasn't reasonable, as you're arguing, how does that affect the validity of the traffic stop, the car search, the warrant affidavit, or the sentencing issues that you've raised? If the search is not reasonable? If it is reasonable? If it's not reasonable. If it's not reasonable. If the frisk wasn't reasonable, what does that have to do? It doesn't invalidate the traffic stop. It doesn't go to the probable cause for the car search. I don't know how it relates to the warrant affidavit or the sentencing issues. So even if you win on that issue, does it really matter? Because if you don't have the methamphetamine that gets found by the officer in the little small packet that's there, then he doesn't get to put that into his search warrant affidavit. Okay. And that is an issue that actually came up in the suppression hearing. But it doesn't affect the car search, correct? It wouldn't affect the car search, that's right. Or the stop. No. Okay. I'd like to actually deal quickly with acquitted conduct, and I'm going to suggest that the Claiborne case, which deals with 28 U.S.C. 2106, is an appropriate avenue because of the dramatic change in the legal landscape that's happened since, I argued, acquitted conduct in February of this year. And the Sentencing Commission stated that it was looking at the McClinton case and then makes its recommendation that acquitted conduct not be considered. And then now that has been enacted. It is not retroactive, and so you can't do a motion under 3582. But you certainly can consider that factor for purposes of the remand of the case, and the judge should consider that. I'd like to reserve the remainder of my time. Thank you. Thank you. Good morning, and may it please the Court. John Alex Romano on behalf of the United States as appellee. The district court correctly denied Mr. Sherwin's motion to suppress and correctly apply the sentencing enhancement for possession of the firearm. And accordingly, we ask that the Court affirm the convictions in the sentence. To begin with the first suppression issue, the stop of Mr. Sherwin's vehicle was lawful for two independent reasons. But first and foremost, because the officer had reasonable suspicion that the vehicle was the same vehicle that was involved in the recent reports of shots fired. Over the span of approximately 46 minutes, as the Court knows, Tulsa Dispatch received eight 911 calls of shots fired. The second call identifies a white pick-up truck. The second call occurs about four miles north of where the stop of Mr. Sherwin's vehicle occurs. As the Court also knows, the seventh call identifies five to six shots fired from a white Chevrolet Silverado. The location of that call is 6515 South Bingo Road. That is the exact location where Officer DeGeorge sees Mr. Sherwin's vehicle about 34 minutes later. And that vehicle is a white Chevrolet Silverado. So the fact that you have a vehicle observed by the officer that matches the make, model, color, and location of a vehicle identified in the shots fired call, we believe, provides the particular and objective basis to establish reasonable suspicion that that vehicle was the one involved in recent shooting activity. And I know a lot of my opponents' arguments focuses on the time lapse, but there are additional factors that support reasonable suspicion here. This was an ongoing emergency. I don't believe there's a dispute that when Officer DeGeorge sees this vehicle, the police, while they might have responded earlier to the scenes, they hadn't found the culprit of these shootings, of these shots fired. And there was a threat to public safety. Second, the Court considered the lateness of the hour. The stop occurs at 1 a.m. There are very few cars on the road. If the Court looks at Video Exhibit 2, which is taken from the patrol car of South Mingo Road to catch up to Mr. Sherwood's vehicle, I think it shows only one or two other cars on the road. So that reduces the chance that this is some strange coincidence that Mr. Sherwood's vehicle happens to match the one in the shots fired call. The Court can also consider the fact that the establishment at 6515 South Mingo Road is closed at the time. I think that's clear from some of the videos, whether it's a shop or a restaurant, it's closed. So there's no reason for the Silverado to be turning into that parking lot at that time. So all of that, we believe, supports reasonable suspicion that Mr. Sherwood's vehicle was, in fact, the one involved in the shots fired call. And if the Court agrees, then it need not go to the second ground, which is the existence of reasonable suspicion to believe that the lights on the rear license plate were not visible up to 50 feet. And I'm prepared to address any questions the Court may have on that issue. We certainly briefed it. I think the question is whether or not the district court's finding, the court made a finding that, to the extent Officer DeGeorge was mistaken about that, that he made a reasonable mistake. And the government submits that that finding was not clearly erroneous by the district court. It isn't a crazy law, though. I mean, have you ever seen a license plate that you could identify at 50 feet? You're younger than I am. I don't know what I have, Your Honor. In fact, in looking at the same video that I know Your Honor did, I couldn't detect, as Officer DeGeorge's vehicle is speeding up to catch up to the Silverado, I did not see it illuminated to 50 feet. I confess that this is the first time I've seen one of these laws, and I'm sure they're probably enforced in other jurisdictions as well. This is my first time dealing with it. I just kind of, it may be academic, but I just wonder if there's a law that says, a state law that says your tag has to be identifiable, has to be legible at 1,000 feet, and you come up and say, yeah, I have a reasonable suspicion to believe that I can identify it at 1,000 feet, so I can stop pretty much any car at some point. That would, I agree that that would be an extreme case, and certainly we're not there in this case. We may or may not be. Okay. And I would just say, just one comment about the jury note. The jury was not asked to find what the district court found here, which is that to the extent there was a mistake, it was a reasonable one. And of course, the jury could see the video and replay it as many times as it wanted to, and to Judge Carson, to your question to my opponent, yes, I think really the video only shows that to the extent the rear tag light is illuminated, it's really just up close, right? So it doesn't answer the question as to whether it's illuminated to a distance of 50 feet. So we submit for all those reasons that the stop of the vehicle was lawful. I'll turn to the protective risk. Here the district court appropriately found that there was a legitimate threat to officer safety, given the number of vehicle occupants, the likelihood that firearms were present, the time and the location of the stop. And Officer DeGeorge, we submit, acted perfectly reasonable by reaching into the left-hand pocket to look for the knife that Mr. Sherwood himself said twice was present. And the first time that Mr. Sherwood says that he has the knife there, Officer DeGeorge doesn't just sort of immediately start rummaging through his pockets. He's still trying to pat him down. Did he say that he had a knife after the pat-down? No. My recollection of the video that he says he has, as the pat-down is beginning, my recollection is that Sherwood says he has a knife there, and then the pat-down continues. And then before Officer DeGeorge reaches into the left-hand pocket, he says again, asks again, something to the effect of, you said you had a knife in here. We can't quite hear what Sherwood's response is. But DeGeorge then says, no, I don't want you to get it. So I think the fair inference is that Sherwood offers to get it for him. So he's confirming there's a knife in there, and he's willing to get it. So it's at that point that Officer DeGeorge reaches into the pant pocket. And we submit that that was perfectly reasonable to do. I don't know that the question's – it's a little bit of a unique question, I think, because as I understand it, the question is not really whether or not the trooper was entitled to reach in. I think the question, I think, as a practical matter is, was he entitled, once he confirmed that there's not a pocket knife, he's got a baggie, he has some cash in a little baggie, that doesn't feel like a pocket knife, whether he can still go ahead, retrieve that. It's the pulling out, so to speak, that really is the question. And why can he, if the idea behind reaching in is for officer safety, because he is told that he's got a pocket knife in his left front pocket, why can't he continue and reach in, grab the baggie, grab the cash, and pull it out? That has nothing to do with officer safety. No, but at that point, and I think we have to remember, he's wearing gloves for his own protection, right? So there's a very possibility that he's feeling on the outside, and he just might be making a mistake and not be able to detect the knife that he's told is in there. Even when he's got his hand in the pocket? And then he reaches in, and the first thing I think he gets, it's really the only thing in the pocket are the baggie and some cash. So why is he getting entitled to pull that out? Well, again, he's wearing a thick glove. This is, from what I could tell, Mr. Sherwood is wearing jeans, so it's not a big pocket where he can maneuver around. He needs to lift it, presumably, to make sure that there's nothing underneath it. I think under the circumstances, that would be reasonable for an officer to do under this situation. So he might think that there was a pocket knife behind the baggie? I think, yeah. Under the objective framework that we look at, we would ask would a reasonable officer sort of continue at that point just to make sure there's not something behind there? I think that would be the question. Yeah, then once he's determined, he obviously confirms that there's not a pocket knife behind the baggie and the cash, right? That's right, but he's already removed it, and I think the law is, I think it's Michigan versus Long that we cite in our case, that once you discover sort of contraband in the course of conducting what is otherwise a reasonable protective frisk, you're not, the officer doesn't have to ignore it at that point. Okay. And I would just say, one last point on protective frisk. I don't think it affects, even if the court were to find that Officer DeGeorge acted unreasonably, it wouldn't affect the conviction. It doesn't affect the validity, the probable cause to search the vehicle. And if you remove that .35 grams of methamphetamine, that information that was discovered in the pocket, if you just take that out of the search warrant affidavit, you still have probable cause to search the cell phones, given all the evidence of drug trafficking activity that is found inside Mr. Sherwood's vehicle. Let me ask you about the search. So the officer pulls up, knocks on the window, the guy puts it down, and he basically immediately starts accusing the guy of acting squirrelly. And at what point does he have something to get in there and search the vehicle? I think it's clear, certainly once he sees. I mean, because the guy wasn't really acting squirrelly, in my opinion, just watching it. I think once he sees the empty gun holster in the center console area, and he remarks about that at minute, I think, 2 and 25 seconds. He says, you have a gun holster there, and it's empty. I think at that point, that takes us over, in the government's view, takes us over the probable cause line. Okay, and that's after he'd already confirmed that two of them were felons with prior gun charges. That's correct. And while I wouldn't use the word squirrelly, and I take your Honor's point, he walks up, and he has to knock on the window to get Kenny Rosenberg, the driver, to roll it down. Rosenberg doesn't have identification on him, even though he's driving. All that occurs before he sees the gun holster. And I think shortly after he sees the gun holster, of course, then Rosenberg reaches for the center console where the gun holster is, and that is certainly furtive conduct in the government's view. And then later on, maybe around the four- to five-minute mark, he has to instruct the female occupant to stop taking her bag. So I think the first five minutes show examples of furtive conduct. It may not have been obvious at the get-go. Do you think it was okay to search based on the open container alone? We have not advanced that argument, Your Honor, in part because, you know, it is a misdemeanor under Oklahoma law, so it might get into a question of whether, you know, at the point he observes it, is it on a public roadway? And then, you know, although we certainly think there's a fair probability that that can of beer was open before it turned off South Mingo Road. It would be very unusual for somebody to be pulled over by a police officer at that point to open a can of beer. But we're certainly not relying on the open container law. So you have about three minutes left, and I'll turn to sentencing and maybe just go straight to the acquitted conduct issue because we think, you know, there's certainly a sound basis for the court to apply the two-level enhancement under 2D1.1b1 on the facts of this case. And the district court did not act inappropriately in relying on acquitted conduct. And that assumes that by virtue of applying this enhancement, it actually sort of relied on acquitted conduct. I think there's a fair question as to that. The amendment to the guidelines only recently took effect, so it only applies prospectively. So the district court applied an earlier version of the guidelines, and the Supreme Court and this Court have said that a sentencing court cannot rely on acquitted conduct as proven by a preponderance of the evidence. The Claiborne case that my opponent has cited in his recent 28J letter doesn't apply here. In that case, the Seventh Circuit remanded under 28 U.S.C. 2106 for the district court to consider a recent amendment to the sentencing guidelines. But in Claiborne, that amendment, which is Amendment 821, was made retroactive by the Sentencing Commission. And that retroactive amendment had taken effect by the time the Seventh Circuit issued its decision. And you just don't have that here. The Sentencing Commission, at a recent August hearing, and we cited the transcript in our 28J letter response, decided not to vote on retroactivity. It decided instead to sort of undertake and consider more generally how retroactivity decisions should be made. I understand your argument. Is the implication of your argument that we really don't have even discretion to do what's being urged on us, which is to remand under 2106? That is correct. Absent a decision on retroactivity by the Sentencing Commission, there is no basis, potential basis, for Mr. Sherwood to seek relief. And for that reason, this Court wouldn't have the discretion that the Seventh Circuit believed it had and concluded that it had under 28 U.S.C. 2106. It is such an unusual circumstance in light of the fact that the Sentencing Commission is continuing to investigate how we address retroactivity. And I'm not trying to settle this dispute. But I just kind of wonder, just as a practical matter, is the most sensible thing to abate the appeal, remand, if the government consents? And I'm not asking you whether you do or not. And to remand, give the district judge an opportunity to say whether or not the district judge would still have imposed the same enhancement in light of the new guideline? I don't think so. I don't mean to reiterate my point, but it just sort of puts the cart before the horse. And certainly, as a question of judicial economy, if the Sentencing Commission decides at some point in the future to make this amendment retroactive, all Mr. Sherwood needs to do is file a motion under 3582C2 in district court, and it's right before the issue, it's right before the district court. That's all that needs to be done to get consideration of the amendment, if it is voted to be retroactive. Thank you very much. Thank you. Mr. Sherwood asked the officer why he was wanting to do this search, and the reason he said was because you have a beer can. He didn't say anything about the gun holster. Sebron and Minnesota Dickerson both have language in it that condemns the rummaging that took place where you're not dealing with a weapon. You don't find a weapon. Thank you. Thank you. Thank you, counsel. The case will be submitted.